REED v. JANES, administrator, et al.

1. Where the subject-matter of sale, purchase and assignment was not a mere naked right of action, but assignable property, such as an execution, mortgage and note, the ownership of which carried with it a right to sue as an incident of such ownership, and where there was no champerty in the contract of assignment, champerty in a collateral contract between the beneficiaries of the purchase, one of whom was husband of the assignee, is no defence to a suit brought and prosecuted by her at the expense of her husband, but for the joint interest of him and his co-beneficiary.

2. It would seem that an agreement between two to purchase assignable property on joint account, one of them to pay for it, the other to bear the expenses of needful litigation, and both to share equally in the net proceeds, is not champertous. In such case, neither is exclusive owner of the property acquired by the purchase, but each is a joint and equal owner with the other.

February 24, 1890.

Actions. Vendor and purchaser. Assignment. Contracts. Champerty. Before Judge MADDOX. Polk superior court. August term, 1889.

In his lifetime, W. F. Janes made to Thompson Colbert a mortgage on certain lands in Dougherty county, to secure a note for $2,200, dated January 5, 1874, and due on or before the next November 15. In 1875, W. F. Janes died, and his son, C. G. Janes, was appointed his administrator. Afterwards Colbert obtained judgment of foreclosure of the mortgage, and on November 10, 1877, execution thereon issued. On August 15, 1885, he transferred and assigned this execution to Mrs. Reed for value received, without recourse on himself; the assignment by its terms embracing also the mortgage and the note on which it was founded. On the 28th of the same month, she brought her bill against C. G. Janes, as administrator, and his mother (now Mrs. Peek), to compel the administrator to sell the mortgaged lands in parcels rather than all together, to have the proceeds applied to the mortgage fi. fa., and incidentally to have Mrs. Peek account for rents of the

land whilst previously in her possession and use, these
rents to be applied to claims in her favor for year's sup-
port, etc., of higher dignity than the mortgage. Among
her allegations were these :

W. F. Janes died insolvent, owing, besides the mort-
gage claim, debts amounting to fifteen or twenty thou-
sand dollars. The property he left consisted mainly of
the mortgaged lands (worth five to eight thousand dol-
lars), his other property not exceeding in value fifteen
to twenty-five hundred dollars. With the active assist-
ance of the administrator, the widow had set apart to
her an excessive allowance for year's support of herself
and five minor children, and an allowance for dower,
part of which was paid to her. The administrator ob-
tained from the ordinary orders for sale of the Dougherty
county property, and by various collusive arrange-
ments (which are set out) allowed a sale made for taxes,
so as to deter bidders at a future sale by himself as ad-
minstrator and have the land knocked off to Mrs. Peek
for less than its value, which was done, and she has re-
ceived large amounts for rents, etc. The latter sale
was set aside on a bill filed by the executors of E. E.
Jones. Another sale by the administrator is contem-
plated and has been advertised ; but the same will be
made in a manner injurious to the rights of the credit-
ors of the estate, who are opposed to it for several rea-
sons stated. The administrator is combining with his
mother to have the land sold and bid in for her for only
what she claims to be due her, which claim is for more
than the balance really due ; and to prevent others from
bidding. He is pecuniarily irresponsible, and his bond
has become worthless by insolvency of the sureties.
The advertisement of sale is insufficient in certain re-
spects stated. On a proper sale, such as complainant
suggests by her objections herein, the property would
bring enough to satisfy not only whatever may be justly

due Mrs. Peek as the balance of her claim, but also a portion of the other debts of the estate, of which complainant's is the principal one; but the administrator's evident intention is, to get the land for his mother for as little as possible, in disregard of the rights of creditors. The prayers were, for injunction; the appointment of a receiver; that an account be taken of the rents chargeable to Mrs. Peek, so as to ascertain how much, if any, is still due on her dower claim against the estate, and to her and her children for year's support; and for general relief.

Besides the several answers of the defendants, they made defence by two pleas. First: The matters complained of in the bill have been passed upon and adjudicated by Polk superior court in the suit by R. E. Mann and E. C. Jones, as executors of E. E. Jones, against these defendants, in which case a decree was rendered at an adjourned term held in June-July, 1885. Said executors represented a large claim against the estate of W. F. Janes, and by that suit, the same being a bill in equity, made the same attack upon the sale of the Dougherty county lands by C. G. Janes, as administrator, as is made by the plaintiff in this bill, and sought also, as plaintiff now does, to recover the rents of those lands since the date of sale; and a verdict and decree were rendered, setting aside the sale and awarding against the defendants in favor of the estate a certain sum for said rents, and this decree remains unreversed and of full force. The mortgage debt now sought to be enforced was, pending said suit and at the time the decree was rendered, held by Colbert, who resided and resides in said county, and though not a formal party, was a witness in said case, and if not sworn, was subpœnaed and present at the trial, and was well aware of all issues involved therein. After said decree, E. C. Jones, who as executor of E. E. Jones was a party

thereto, bought the [mortgage execution] to be by him transferred to the present plaintiff, Mrs. Reed. But this transfer was procured by W. G. Reed, the husband of the plaintiff, in manner and for the purposes hereinafter shown, he causing the transfer to be so made to his wife to prevent the same being reached by his own creditors; she really paying nothing for it. But W. G. Reed, though no party to nor having any interest in said former suit, was very active throughout the pendency of the same in assisting the plaintiffs therein; was fully aware of the issues involved; and it was upon his advice that said mortgage was bought by said Jones from Colbert and transferred to his wife; and said transfer was so procured and made for the purpose of enabling W. G. Reed to institute and carry on the present suit, as more fully shown in the following plea:

Second. After the decree in the former suit, it was evident that nothing could be collected on the mortgage unless a larger sum could be recovered for rent than awarded by the decree, as prior claims against the estate would consume all that the lands would probably bring on a resale, and all of the rents awarded. And W. G. Reed, who had officiously and industriously intermeddled in the prosecution of the former suit, urged E. C. Jones to buy the mortgage from Colbert (who was unwilling to undertake the litigation) and bring the present suit for its enforcement; but said Jones was himself unwilling to undertake any such litigation; whereupon said Reed, in order to carry on the litigation himself, induced said Jones to buy up said mortgage and cause the same to be transferred to the wife of said Reed, he agreeing to carry on the litigation at his own expense, or to carry it on without any agreement as to costs or expenses, and to pay said Jones one half of whatever he might so recover. Said Reed's reasons for causing the mortgage to be transferred to his wife and

conducting the litigation in her name were, that he was himself encumbered with debt and the recovery might be reached by his creditors. Neither he nor his wife paid anything whatever for said mortgage, and the transfer thereof to her was solely to enable him to undertake and prosecute the present suit in her name, upon the terms and for the objects aforesaid. Defendants therefore say that said suit is based upon a title derived under a champertous contract and arrangement, which ought not to be countenanced by a court of equity.

The complainant demurred to this plea and moved to strike it, as furnishing no valid defence to the suit. So much of it as set up that the matters of this case were adjudicated in the former suit referred to, was stricken; but the demurrer as to the plea of champerty was overruled. On the hearing of this demurrer, it was agreed by counsel and the court that the facts that complainant is the niece of the wife of Dr. E. C. Jones, and W. G. Reed is Dr. Jones' nephew, should be considered as forming a part of the plea of champerty. On this plea alone the parties went to trial, and the facts as to relationship just stated were submitted to the jury as a part of the plea. The defendants introduced, as the contract between complainant and Dr. Jones under which the mortgage *fi. fa.* was transferred, the following:

"Mrs. Willie E. Reed is to pay to Dr. E. C. Jones one half of the amount she realizes out of the Colbert mortgage *vs.* W. F. Janes, dec. That is to say, after the expenses and attorneys' fees are paid, the balance to be equally divided between Dr. E. C. Jones and Mrs. Willie E. Reed.

"Aug 29th, 1885.        (Signed)        W. E. REED
"Test: E. E. JONES.                by W. G. REED."

Also testimony tending to show that in 1885, W. G. Reed made statements to the effect that the mortgage *fi. fa.* had come into his possession or ownership, and he supposed he would have to settle it through the

courts; that Colbert and Dr. Jones were unwilling to prosecute the claim; that Dr. Jones was to give him (Reed) half of what he could make out of it; that there was no one willing to prosecute it but himself, and he was going to do it, and had obligated himself to work up and prosecute the case as best he could, as Dr. Jones was lukewarm and didn't care to be mixed up with it; that Jones, Colbert and W. F. Janes came into possession of property in Dougherty county, and Jones and Colbert traded their interest to Janes, but previously they made a joint note to Sproull, and Dr. Jones got hold of that matter, and he (Reed?) had gotten hold of the *fi. fa.*, and now had all the claims against the estate of Janes and intended to press them; and intimated that he had partly frightened Colbert, by reason of some former transaction with him, into turning over the mortgage *fi. fa.* He was talking about the case of E. E. Jones, executor, *v.* Janes *et al.*; manifested much interest in the same and in Dr. Jones' business matters, had assisted him therein and was with him a great deal.

W. G. Reed testified: The contract between Dr. Jones and complainant, and the transfer of the mortgage execution, are correctly dated, the signatures thereto having been made on those dates. The contract was made because we found that the whole of the claim was made over to complainant, when, under our agreement, only half of it was to go to her. Dr. Jones and I had been in a large lawsuit; we made a settlement, in which he agreed to give my wife half of the mortgage execution. I claimed that he owed me five or six hundred dollars, which he denied; and we agreed to settle these matters amicably in this way. Colbert was owing Dr. Jones. I saw Colbert and asked him if a friendly arrangement could be made between them; and he said it could. We made some kind of settle-

ment, which I suppose was illegal, but it was annulled; and Colbert agreed to give his mortgage to Dr. Jones if he would release him from the obligation he was under to Dr. Jones for money he had paid out for him, and from an execution Dr. Jones had paid off—the Sproull execution, issued before W. F. Janes' death, for $1,300 and interest; also from part of another claim against Janes, Colbert and Jones, which Jones had taken up, one third of which I think was $700. Jones released Colbert from all these claims, and Colbert gave him the mortgage *fi. fa.*, which he instructed Colbert to transfer to complainant, as he said, for love and affection. He did so of his own free will and accord, in satisfaction of my matter. All our matters were settled and merged into it. I positively refused to have anything to do with the expenses or attorneys' fees; Dr. Jones was to do that himself; he did pay all the expenses, except the stenographer's, and would have paid that if he had not died. He did not keep and collect the mortgage execution himself, because he was in feeble health. He was almost like a father to me; asked me to assist him in it; knew that I knew all about it. In the other suit, I did all in my power to make the money subject. Dr. Jones was a party thereto, as executor. My grandfather had advanced money on these notes; I was one of the legatees of the estate and anxious that it should be recovered; Dr. Jones needed help and looked to me to help him. He sent me to see Colbert and told me what arrangement he wanted to make with him. I assisted Dr. Jones a great deal. After the transfer to my wife, I tried to get a compromise of the claim; expected to have to sue when I took the transfer, but tried after that to effect a compromise and could not. I used no force to induce Colbert to transfer the execution; never told defendant's witnesses that I did anything to force Colbert or Jones, or that either of

them was unwilling to prosecute the claim. Did not, in fact, get the paper because they were unwilling to do so. Dr. Jones was not unwilling; he said he would prosecute it as far as it could go. He felt that he had been badly treated about it. Colbert is a man who does not like to have trouble in the courts or anything of that kind. I thought the claim a just debt, and thought I could collect it. Nothing has ever been paid on it. For transferring it I gave Dr. Jones no receipt for my claim; he said he would transfer it for natural love and affection; what he owed me was not considered. Probably I did tell defendants' witnesses and others that I threatened to get the Sproull *fi. fa.* and levy it on the Dougherty county place, and that forced Colbert into the settlement; I do not remember; if I did, it was not true.—Further testimony of this witness was to the effect that some of the expense of the present litigation was paid by Dr. Jones, who had been dead about two years, and some by Reed, the latter having paid out sundry amounts before and since said death. There was testimony by one of the complainant's solicitors as to efforts to collect something on this claim by compromise without suit, and tending to show that the claim was not procured to bring suit mainly, but to collect the debt, and if possible, to do so without suit.

Thompson Colbert, for complainant, testified: Dr. Jones held the Sproull *fi. fa.*, which was against myself, himself and W. F. Janes, and proposed to turn it over to me if I would transfer the mortgage *fi. fa.* to him; and I settled with him in this way. Complainant paid me nothing; the only consideration for the mortgage *fi. fa.* to me was the Sproull *fi. fa.* Janes had, as I understood, paid one third of the latter, that is, of the original debt; and I thought Dr. Jones and I should pay the other two thirds. I think the balance due on the

Sproull execution was between thirteen and fourteen hundred dollars. No one forced me to make the settlement; Reed did not do it; it was voluntary on my part ; I think I made the first proposition, am not certain, but there was no forcing about it. Why I made no effort to collect the mortgage debt sooner was, that Janes, administrator, frequently promised to pay it, and I supposed he would do so if ever he was able, and it was thus put off. I did not feel that I was able to collect it by law. I did not have the money to pay for it. A few days after the decision was rendered in the case of the Jones estate against the Janes estate, I met Janes, administrator, and asked him what he proposed to do for me; but got no satisfaction. I supposed it would take all the money he had to pay his mother her year's support and dower. They made a proposition to settle for even less than they had allowed; and I supposed I would not get anything; don't know that he said so. I had previously made propositions to him to settle the matter.

There was conflicting testimony to impeach and sustain Reed as a witness.

The verdict was, "We, the jury, sustain this plea." The complainant moved for a new trial; the motion was overruled; and to this, as well as to the overruling of the demurrer to the plea of champerty, the complainant excepted.

E. N. BROYLES and I. F. THOMPSON, for plaintiff.

C. N. FEATHERSTON, for defendants.

BLECKLEY, Chief Justice.

1. There is a well-grounded distinction between direct champerty and collateral champerty. Collateral champerty is exterior to suit, and though affording a motive for carrying on the litigation, is not directly involved in it as matter for decision or adjudication in the pending controversy. Hilton *v.* Woods, L. R., 4

Eq. Cas. 432. According to the great weight of authority, collateral champerty is not available as a defence to the action, whether the proceeding be at law or in equity, unless there be some statutory provision controlling the question. Courtright v. Burnes, 13 Fed. Rep. 317, and notes thereto by Judge Thompson; 3 Am. & Eng. Encyc. L. 86; Greenhood Pub. Pol. 418, 419; Robison v. Beall, 26 Ga. 17; Boone v. Chiles, 10 Pet. 218. The plea in this case does not allege any vicious agreement or contract to which Colbert, from whom the title to the execution, mortgage and note was derived, was a party. He was the assignor, and Mrs. Reed the assignee. The ultimate contract of assignment, therefore, was between them, and that is the contract—not the one between Jones and Reed—which gave origin to the title of Mrs. Reed involved in her bill. True she did not furnish the consideration for the assignment,—that was furnished by Jones; but under the code, §2747, it matters not from whom the consideration of a contract moves. Moreover, as between Jones and Colbert, there is no suggestion in the plea that there was any champerty. Colbert retained no interest in the property assigned or its proceeds, and was to have no fruit of any litigation that might ensue. The title in its passage from Colbert to Mrs. Reed being wholly without taint, she acquired all the rights that he had, the code, §3597, declaring that "Any plaintiff or transferee may bona fide, and for a valuable consideration, transfer any judgment or execution to a third person, and in all cases the transferee of any judgment or execution shall have the same rights, and be liable to the same equities, and subject to the same defences, as the original plaintiff in judgment was." This transfer, as between Colbert and Mrs. Reed, and as between Colbert and Jones, was to all appearance bona fide. Nothing is suggested in the plea to the contrary, nor is

it suggested that it was not for value as the assignment itself imports on its face.

The assignor, as we have said, retained no interest in the property transferred, and stipulated for no share in the proceeds of any litigation that might ensue. Mrs. Reed may be considered as holding the title as trustee for Jones and Reed; not for Jones alone nor for Reed alone, but for both. Had the assignment been made directly to one or both of them, it would have been no more nor less tainted by their so-called champertous agreement than it was after being made to Mrs. Reed for their joint benefit. Inasmuch as all choses in action arising upon contract are now assignable under the code, §2244, there would seem to be no longer a public policy against the purchase of such claims, although at the time of the purchase it might be in contemplation to bring suit for the purpose of realizing the fruits of the purchase. Now that all choses in action not originating in tort may be bought up so as to pass title both legal and equitable to the assignee, there would seem to be no consistency in denying to the assignee a right to bring and maintain an action in each and every case where an action might be necessary to reach and realize the debt or obligation which is the subject of assignment. One may buy an insolvent claim as freely as a solvent one, a litigated claim as freely as an unlitigated claim. Why not? There is a plain distinction between purchasing a mere lawsuit and purchasing a judgment, execution, promissory note or other evidence of debt to the ownership of which a right of action may be incident. Even an action of tort may be maintained by the purchaser of personal property not in the possession of the seller at the time of the sale. Hall v. Robinson, 2 Comst. 293; Robinson v. Weeks, 6 How. Pr. 161. See further, as to distinction between selling property and a mere right of action, Hodgson v. Western

R. Co., 7 How. Pr. 492. The code, §2695, allows the sale of real property whilst held by an adverse claimant, and thus changes the prior law as to maintenance in that class of cases. As there was no champerty in the contract by which the assignor of the execution, mortgage and note parted with title to the assignee, and as the plea alleges no champerty in that contract, but only in the collateral contract between Jones and Reed, the real purchasers of the property assigned, the court erred in not striking the plea and in overruling the plaintiff's demurrer to the same.

2. Though not necessary to a decision of the case, we will add that were the suit founded on the contract between Jones and Reed, we should hesitate to hold that even that contract was tainted with champerty. If so tainted, it could not be enforced. Code, §2750. But it seems to us that two persons may lawfully agree to purchase jointly an execution, etc. against a third person, upon any terms satisfactory to themselves as to which of them shall pay the purchase money and as to bearing the burden of expense in conducting any litigation necessary to engage in for the purpose of realizing the fruits of the purchase. Here Jones advanced all the purchase money, but that did not render him sole owner of the beneficial interest in the purchase. Reed was to be a joint and equal owner with him, and though the contract between them may have burdened Reed with the whole of the expense incurred, or to be incurred, in conducting the litigation, such burden was but a method selected by the parties to arrive at his share of the cost of the net proceeds of the execution, etc., in which they were to have ultimately a joint and equal interest. In what respect does such a transaction differ from a partnership for a single venture in which one of the parties contributes capital and the other personal services? Here, Jones was to make, and did make, the purchase from Colbert, paying him the entire

consideration therefor, but in so doing he acted not for himself alone, but for Reed also, and as soon as the assignment by Colbert took place, it passed the title to Mrs. Reed quite as much for the benefit of Reed as for that of Jones. The expenditures made by Reed, or to be made by him thereafter, would inure as much to his own interest as to that of Jones, and the authorities all agree in holding that where the expenses of a suit are incurred and defrayed by reason of an interest in the ownership of property to which the suit is incident, there is neither maintenance nor champerty. 3 Am. & Eng. Enc. of Law, 76. In any and every view that we can take of the subject, we are unable to discover any legal foundation for the plea of champerty in the present case, whether tested by the allegations of the plea itself or the evidence adduced to support the same.

*Judgment reversed.*